IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Mary Bishop, o/b/o Jamie J. Austin, ) | |
| ) | Civil Action No. 6:06-2785-HMH-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff, Jamie J. Austin, filed applications supplemental security income (SSI) benefits in June and September of 1985, both of which were denied at the initial level with no further action. In October 1990, the plaintiff filed applications for disability insurance

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

benefits (DIB) and SSI, both of which were denied through the hearing level with no further action.

The plaintiff filed her current applications for DIB and SSI on July 30, 2002, and July 23, 2002, respectively, alleging that she became unable to work on June 27, 2002. The applications were denied initially and on reconsideration by the Social Security Administration. On November 6, 2003, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her representative, her mother as witness, and a vocational expert appeared on September 9, 2004, considered the case *de novo*, and on January 25, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. During the appeal process, the plaintiff died, and her mother filed a substitution of claimant form. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 28, 2006. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)   The claimant has arthritis, decreased vision and mental disorders, impairments that are "severe" within the meaning of the Regulations but not "severe" enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. 20 CFR §§ 404.1520(c) and 416.920(b).
>
> (4)   The undersigned finds the claimant's allegations unsupported by the substantial evidence of record and therefore, less than fully credible.

(5) The claimant retains the residual functional capacity for light work activity with restrictions that require simple, routine tasks, performed in a supervised, low stress environment, with occasional interaction with the public and no one-on-one interaction with the public; no team effort with other employees, and no high productivity jobs.

(6) The claimant is unable to perform any of her past relevant work due to her non-exertional limitations (20 CFR §§ 404.1565 and 416.965).

(7) The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § § 404.1563 and 416.963).

(8) The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

(9) Transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

(10) The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

(11) Although the claimant's limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include the light, unskilled jobs of garment sorter, garment bagger and cloth folder.

(12) The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the

national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 41 years old at the time of her alleged onset of disability on June 27, 2002. She was a high school graduate who attended special education classes and had past relevant work experience as a cook, waitress, nurse's aide and cafeteria counter attendant.

5

The record reveals that on September 9, 1995, an agent of the South Carolina Vocational Rehabilitation Department administered the BETA II test to the plaintiff. She received a score of less than 60. The vocational rehabilitation agent indicated that the plaintiff's IQ was below the borderline range and opined that she met Vocational Rehabilitation Department's guidelines for mental retardation. The test results were reviewed by the staff psychologist, R.B. Wingard, M.S. (Tr. 131).

On August 6, 2001, the plaintiff presented to Dr. Arland Compton for a work physical. The plaintiff reported a past history of panic attacks that improved with medication. The plaintiff's examination was unremarkable and no restrictions were placed on her activities (Tr. 132).

On October 29, 2001, the plaintiff reported to the emergency room with complaints of a "nervous breakdown." Treatment notes reflect that the plaintiff was depressed due to the death of her friend and that she had financial stressors. She was discharged with instructions to report to the Mental Health Center (Tr. 159-63).

On June 20, 2002, the plaintiff presented to the Tuomey Hospital emergency room requesting that she be committed. She was delusional and reported increased difficulties sleeping and suicidal ideations. The plaintiff was admitted for psychiatric placement (Tr. 133-44). On June 26, 2002, Dr. William King noted that the plaintiff was still delusional with hallucinations and opined that she might be mentally retarded (Tr. 134). The plaintiff was transferred to G. Werber Bryan Psychiatric Hospital on June 27, 2002, and discharged on July 11, 2002 (Tr. 164). During her hospital stay, she was diagnosed with hypothyroidism and started on medication (Tr. 164).

On July 15, 2002, during an initial intake at the Sumter Mental Health Center, the plaintiff reported taking her medication and denied hallucinations. She was diagnosed with psychosis due to hypothyroidism and borderline intellectual functioning and started treatment with Dr. King (Tr. 185). On July 23, 2002, Dr. King determined that the plaintiff's

6

current global assessment of functioning (GAF) was 60,[2] and he diagnosed borderline intellectual functioning (Tr. 182). Treatment notes from October 2002 through February 2003 indicated that the plaintiff's medications were adjusted and on February 3, 2003, she reported that she was doing well, did not feel anxious or depressed, and did not have any medication side effects (Tr. 176-81).

On September 30, 2002, the plaintiff reported to S. A. Wurster, Ph.D., for a psychological evaluation. The plaintiff reported that she had attended school through the twelfth grade and had been in special education classes. She also reported that she watched television, played cards, colored in coloring books, helped with household chores, attended church, visited with friends, and shopped with her mother. Examination revealed that the plaintiff's affect was appropriate and that she was able to follow simple directions with no indications of impaired concentration or memory functions. She was administered the Wechsler Adult Intelligence Scale (WAIS-R) test and obtained a full scale IQ of 75, verbal IQ of 75, and performance IQ of 76, indicative of mid borderline range of intelligence. Dr. Wurster noted that the consistency of the plaintiff's subtest scores on both the verbal and performance scales suggested that the test results were a valid index of her level of mental functioning. Dr. Wurster diagnosed borderline intellectual functioning and a personality disorder (Tr. 166-68).

On October 7, 2002, the plaintiff presented to Dr. Forrest Pommerenke for a consultative physical examination at the request of the State agency. The plaintiff reported that she had arthritis all of her life, but had not seen a physician and was not taking any medication for it. She also reported that as long as she took her medication, she did not suffer from hallucinations. Examination revealed 20/70 vision in the right eye and 20/100

---

[2]A GAF of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM) 32 (4th ed. 1994).

vision in the left eye; normal gait, negative straight leg raising; normal range of motion; normal mood; logical thought processes; and average intelligence. Dr. Pommerenke diagnosed psoriasis-stable; possible psoriatic arthritis; hypothyroidism-stable and non-progressive; mild hypertension; and schizophrenia. He opined that the plaintiff's residual functional capacity was light to medium work and further opined that she had some kind of developmental problem, possibly related to her thyroid or other congenital problem (Tr. 169-72).

On October 29, 2002, Dr. Darla Mullaney reviewed the plaintiff's records at the request of the Commissioner and completed a Physical Residual Functional Capacity Assessment. Dr. Mullaney determined that the plaintiff had no exertional limitations and was limited in far visual acuity (Tr. 231-38).

On November 12, 2002, Lisa Smith Klohn, Ph.D., reviewed the plaintiff's records at the request of the Commissioner and completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment. Dr. Klohn determined that the plaintiff's mental impairments (borderline intellectual functioning, schizophrenia, and personality disorder) resulted in moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation. She also determined that the plaintiff's abilities to understand, remember and carry out short simple instructions; sustain an ordinary routine without special supervision; respond to criticism from supervisors and get along with coworkers; and respond appropriately to changes in the work setting were not significantly limited. Dr. Klohn further determined that the plaintiff was able to perform simple tasks for two plus hours at a time without special supervision (Tr. 212-30).

On September 4, 2003, Samuel Goots, Ph.D., reviewed the plaintiff's records at the request of the Commissioner. He determined that the plaintiff's mental impairments

resulted in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation. He also determined that the plaintiff's ability to understand, remember and carry out short simple instructions was not significantly limited (Tr. 190-206).

In February 2004, the plaintiff began seeing Dr. David Justice for psychiatric treatment. Dr. Justice diagnosed borderline intellectual functioning, major depressive disorder with psychotic features, hypothyroidism, and hypertension (Tr. 242-43).

On March 11, 2004, an eye examination revealed that the plaintiff had no vision in her right eye due to a cataract (T. 239).

On March 24, 2004, the plaintiff reported to Dr. Justice that she was doing better with her grief (Tr. 241), and by May 19, 2004, she reported that she had good control of her mood and psychotic symptoms, was doing great and had actively processed her grief related to her brother's death (Tr. 240). Examination on May 19, 2004, revealed appropriate behavior, normal speech, logical thought processes, intact memory, good judgment, and no auditory or visual hallucinations (Tr. 240). Dr. Justice determined that the plaintiff's GAF was 75[3] (Tr. 240).

At a follow-up appointment on August 11, 2004, the plaintiff reported that she was "fine" and denied any active psychotic symptoms. Examination revealed appropriate behavior and affect, logical thought processes, intact memory, good judgment, and no evidence of auditory or visual hallucinations. The plaintiff was diagnosed with major depressive disorder, borderline intellectual functioning, hypothyroidism, and hypertension and her GAF was determined to be 75 (Tr. 249).

---

[3]A GAF of 71-80 indicates no more than slight impairment in social, occupational or school functioning. DSM 32 (4th ed. 1994).

9

On September 8, 2004, the plaintiff's representative requested that Robert Brabham, Ph.D., review the psychological evaluation completed by Dr. Wurster, The plaintiff's school records, and the test results reviewed by Mr. Wingard (Tr. 127). Dr. Brabham opined that the plaintiff met the requirement for a diagnosis of mental retardation (Tr. 128).

At the hearing, the plaintiff testified that she attended special education classes, repeated the eleventh grade, graduated from high school and received a diploma (Tr. 280-81). She testified that she had a cataract in her right eye and had trouble seeing out of her right eye (Tr. 281-82). She testified that she had had a number of jobs since 1989 and had been fired from many of them (Tr. 284). She testified that she had a driver's license and drove, watched television, read, played cards, did word puzzles and helped with household chores (Tr. 286-89).

The plaintiff's mother testified that the plaintiff helped "a little bit" around the house, watched television, colored, and did word puzzles (Tr. 291-92). She also testified that the plaintiff failed kindergarten and one other grade (Tr. 293).

Carroll Crawford, a vocational expert, testified that based upon the plaintiff's residual functional capacity, there were other light, unskilled jobs in the national economy that she could perform such as a garment sorter, a garment bagger, and a cloth folder (Tr. 298-99).

As stated above, the plaintiff died during the administrative appeal process, and her mother is now pursuing her claim.

## ANALYSIS

The plaintiff alleges that the ALJ erred by failing to consider all the medical evidence and failing to find that she met Listing 12.05(C). *See* 20 C.F.R. Appendix 1, Subpart P, Listing 12.05(C). The regulations state that upon a showing of a listed

10

impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §404.1520(d).

Listing 12.05 is the listing related to mental retardation. Mental retardation refers to "a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period [before age 22]." 20 C.F.R. Part 404, Subpt. P, App. 1, §12.05. Further, "[t]he required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied." *Id.* A claimant is to be found disabled under Listing 12.05(C) if he or she has the following: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Id.*

The ALJ found that the plaintiff's arthritis, decreased vision, and mental disorders were severe impairments. However, he found they did not meet or medically equal any of the Listed Impairments. In finding that the plaintiff did not meet a listing, the ALJ stated as follows:

> It was also indicated by the claimant's treating source that she appeared to have below average intellectual functioning. Accordingly the claimant was referred by the Social Security Administration for psychological testing on September 30, 2002, by Dr. S.A. Wurster, a clinical psychologist. Dr. Wurster found the claimant to be alert and oriented with "no indications of a mental health illness" at that time. The claimant was cooperative and well-motivated during testing and was able to comprehend and follow simple directions with no indications of specifically impaired concentration or memory functioning. Her activities of daily living included watching television, eating lunch, taking a nap, playing cards or coloring. On weekends, she attends church, visits with friends and goes to the mall. She helps with household chores, grocery shops with her mother and enjoys going bowling when she has the money for it. Testing via the Revised Wechsler Adult Intelligence Scale (WAIS-R) reveal a full scale IQ of 75 consistent with mid borderline range of intelligence. Test results were considered valid and there was no indication that she had ever functioned at a level significantly higher. The claimant's performance on Wide Range Achievement Testing (WRAT-R) showed that she

11

> was reading at the 8th grade level and performing mathematics at the 4th grade level. These results were consistent with the client's intelligence, but not with her report of being in Special Education classes, and it was thought perhaps she was actually in resource classes. Results of Bender Gestalt designs ruled out significant organic impairment, and D.A.P. testing was suggestive of a simple, immature individual with passive dependency. In conclusion, Dr. Wurster considered the claimant capable of performing routine unskilled work tasks of concentrating at such tasks for two-hour periods of time. The claimant was independent in caring for personal needs and was capable of avoiding common physical dangers. Referral to Vocational Rehabilitation for job training was recommended.

(Tr. 26-27).

The plaintiff argues that the ALJ did not consider all the medical evidence regarding the plaintiff's mental limitations. This court agrees. The ALJ cited the testing done by Dr. Wurster in September 2002, in which the plaintiff obtained a full scale IQ of 75, verbal IQ of 75, and performance IQ of 76 on the WAIS-R, which are indicative of mid borderline range of intelligence (Tr. 166-68). The ALJ, however, failed to cite or apparently even consider other evidence regarding the plaintiff's mental limitations. In September 1995, R.B. Wingard, a staff psychologist at Vocational Rehabilitation, tested the plaintiff's IQ and found that the plaintiff met Vocational Rehabilitation's guidelines for mental retardation (Tr. 131). Mr. Wingard did not use the Weschler series when testing the plaintiff's IQ scores. Instead, he utilized the ABLE ("Adult Basic Learning Examination") and the BETA II tests. The introduction to the mental retardation listing (12.00) states:

> Due to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, e.g., where

> verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.

20 C.F.R. Part 404, Subpt. P, App. 1, §12.00D(6)(c).

This listing makes clear the Weschler series is not required, but if a test deviates from the mean of 100 and a standard deviation of 15, a conversion must be made so the actual degree of limitation can be determined. As stated by the plaintiff, the BETA II test has a mean of 100 and a standard deviation of 13.6. That means that one standard deviation below the mean would be 86.4; two standard deviations below the mean would be 72.8; and three standard deviations below the mean would be 59.2. The plaintiff scored <60 on the BETA II – three standard deviations below the norm. On the Weschler series tests, one standard deviation below the mean would be 85; two standard deviations below the mean would be 70 (a marked limitation in intellectual functioning which meets the first prong of the mental retardation listing of 12.05); and three standard deviations below the mean would be 55. The plaintiff's score of <60 on the BETA II test is the equivalent of her scoring a 55 on the Weschler series, which would mandate an automatic finding of disability under Listing 12.05A with "a valid IQ score of 59 or less."

In September 2004, Dr. Robert E. Brabham, a licensed psychologist, reviewed Dr. Wurster's evaluation of the plaintiff from 2002, the plaintiff's public school records, and the results of testing by Mr. Wingard in September 1995 (Tr. 127-28). In that evaluation, Dr. Brabham stated:

> *Clearly the report as prepared by [Mr.] Wingard is more consistent with the vast preponderance of other evidence in her files, and thus would be a far more valid measure* of her intellectual and adaptive skills than the scores and intellectual levels suggested by Dr. Wurster.
>
> The rationale for my opinion is based on several facts, such as the several factual and anecdotal errors in Dr. Wurster's report, raising the possibility that his dictation was somehow confused and records perhaps transposed. For example, he stated

> emphatically that ". . . she had not gone to the VR Department . . .," when you indicate that she had been a client there several times. He also noted ". . . there was no indications of a mental illness . . . ," and yet she has a history of having been treated for schizophrenia. He also describes her activities of daily living as including ". . . coloring with crayons in children's books . . ." which is generally regarded as indicative of significantly impaired intellectual abilities when seen in adults.
>
> He also apparently dismissed her reports of having been in "Special Education Classes" and introduced some distinction between special education and resource classes, a distinction that I doubt existed at the time that Ms. Austin would have been in school. *More importantly, a review of her school records confirms that she obtained very poor grades, failed grade after grade, and was placed in grades with little valid cause, certainly not based on her earned grades.*
>
> [Dr. Wurster's] conclusion that someone with a 4th grade arithmetic level would be inconsistent with reports of having been in special education classes seems to be a clear error in dictation or transcription. Having been in school for 12 years, but with such low scores, would typically be evidence of the validity of special education classes, not an inconsistency. *Surely there was some error in the report, as I do not believe that he intentionally made such a statement*, with her school records providing ample evidence of academic deficits.
>
> Again, her school records confirm poor academic performance throughout her educational program, apparently beginning with having *failed even the first grade in another state, followed by failure after failure in SC as well.* The abundance of poor grades, year after year, provides a pattern of poor performance, and is not consistent with a finding of "mid-borderline" IQ scores as stated by Dr. Wurster.

(Tr. 127-28) (emphasis in original).  Dr. Brabham concluded by stating, "[I]t is my strong opinion that the additional evidence in the school records clearly supports the opinion that *she meets the requirements for a diagnosis of mental retardation rather than borderline intellectual functioning*" (Tr. 128) (emphasis in original).

The test given by Dr. Wurster in 2002 was the WAIS-R.  As pointed out by the plaintiff, the test was outdated at the time it was given to the plaintiff.  The revised version

14

of the WAIS-R came out in 1997 and was called the WAIS-III. Accordingly, the revised test had been out for five years at the time Dr. Wurster gave the plaintiff the WAIS-R. The defendant does not address this issue in its brief.

The evidence shows that the deficits in the plaintiff's adaptive behavior were initially manifested before age 22, as required by Listing 12.05(C). The plaintiff began first grade at age nine, then failed second grade and had to repeat it in Special Education classes. She would have been just under age 16 starting the seventh grade, so she was placed in ninth grade Special Education classes. Additionally, the plaintiff failed numerous classes throughout her school career (Tr. 66-67).

The plaintiff also argues that even if the ALJ was correct in relying on the WAIS-R IQ testing, the ALJ did not properly consider whether the combination of her impairments was medically equal to any listed impairment. The Commissioner has issued instructions for determining medical equivalence through the Program Operations Manual System ("POMS") for people who score between 70-75 on an IQ test. The applicable POMS provides:

> D. Determining Medical Equivalence in Particular Situations
>
> 1. MEDICAL EQUIVALENCE AND MENTAL RETARDATION
> Listing 12.05C, Mental Retardation and Autism, applies primarily to adults with significantly subaverage intellectual functioning and deficits in adaptive behavior that were initially manifested in the individual's developmental period (before age 22). As with other mental impairment categories, the focus of Listing 12.05 is on the individual's inability to perform and sustain critical mental activities of work.
>
> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g. 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination.

15

(POMS § DI 24515.056). Even assuming the WAIS-R scores were valid, the "Commissioner will consider medical opinions of designated medical or psychological consultants." 20 C.F.R. § 404.1526. Mr. Wingard is a Staff Psychologist employed by the State of South Carolina Department of Vocational Rehabilitation. Thus, his findings should have been considered by the ALJ in determining whether the plaintiff's impairments were medically equal to Listing 12.05C.

Further, Dr. William King, a psychiatrist, saw the plaintiff during her hospitalization in June 2002. At that time, Dr. King reported in his notes that he suspected that the plaintiff might be mentally retarded (Tr. 134).

The evidence also shows that the plaintiff had additional severe mental and physical impairments that significantly limited her ability to perform work-related activities, and thus the requirements of Listing 12.05C were met. The plaintiff suffered from a right eye cataract, background diabetic retinopathy, diabetes, arthritis, hypertension, hypothyroidism, psychosis secondary to hypothyroidism, major depressive disorder, recurrent, severe; and feet disfigurement. The ALJ noted the feet disfigurement at the hearing (Tr. 298) but did not mention it in the decision. The plaintiff was evaluated for her right eye cataract on March 11, 2004, by Dr. Mardesich of Carolina Eye Center. Dr. Mardesich noted the plaintiff to have "0 vision OD [right eye]." Dr. Mardesich also noted the cataract to be "totally white" and recommended that the plaintiff go the Commission for the Blind to seek removal. Dr. Mardesich also stated the plaintiff had diabetes with background diabetic retinopathy (Tr. 239).

Based upon the foregoing, this court finds that the ALJ erred by failing to consider all the medical evidence, and substantial evidence does not support his finding that her impairments did not meet or were not medically equal to Listing 12.05(C). This court further finds that reopening the record for more evidence would serve no purpose.

16

**CONCLUSION**

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits. Reopening the record for more evidence would serve no purpose. *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974). Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. §405(g) and that the plaintiff be awarded benefits.

s/William M. Catoe<br>
United States Magistrate Judge

October 24, 2007

Greenville, South Carolina