IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Mary Bishop, o/b/o, | ) | |
| Jamie J. Austin, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 6:06-2785-HMH |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Michael J. Astrue, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court with the Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 of the District of South Carolina.[1]  Mary Bishop, on behalf of Jamie J. Austin ("Austin"), seeks judicial review of the Commissioner of Social Security's ("Commissioner") denial of Austin's application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act.  In his Report and Recommendation, United States Magistrate Judge William M. Catoe recommends reversing the Commissioner's decision and awarding the Plaintiff benefits.  The Commissioner objects to the recommendation.  For the reasons stated below, the court accepts the Magistrate Judge's recommendation, reverses the Commissioner's decision, and awards the Plaintiff benefits.

---

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court.  See Mathews v. Weber, 423 U.S. 261, 270 (1976).  The court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made.  The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions.  See 28 U.S.C. § 636(b)(1).

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts are fully set forth in the decision of the administrative law judge ("ALJ"), (R. at 23-33), and summarized as follows. At the time of the ALJ's decision on January 25, 2005, Austin was a forty-four-year-old woman with a high-school education. (Id. at 24.) Her past relevant employment includes work as a cook, waitress, nurse's aid, and cafeteria counter attendant. (Id.) Austin filed applications for SSI in June and September 1985, which were both denied at the initial level. Austin filed applications for DIB and SSI in October 1990, which were also denied. The instant applications for DIB and SSI were filed on July 30, 2002, and July 23, 2002, respectively. Austin alleges that she has been disabled since June 27, 2002, due to rheumatoid arthritis, psoriasis, bladder difficulties, hypothyroidism, and mental disorders. (Id.)

The applications were denied initially and on reconsideration. (Id. at 23.) After a hearing held September 9, 2004, the ALJ issued a decision dated January 25, 2005, denying benefits. (R. at 23-33.) Austin died during the appeals process and Bishop filed a substitution of claimant form. The ALJ's decision became final upon approval of the Appeals Council on July 28, 2006. The Plaintiff filed the instant action on October 5, 2006.

## II. REPORT AND RECOMMENDATION

In her brief to the Magistrate Judge, the Plaintiff argued that the ALJ erred by failing to consider all the medical evidence and failing to conclude that Austin met Listing 12.05(C), the listing for mental retardation. (Pl.'s Br., generally.)

Magistrate Judge Catoe recommends reversal and an award of benefits because the "ALJ erred by failing to consider all the medical evidence, and substantial evidence does not support

2

his findings that her impairments did not meet or were not medically equal to Listing 12.05(C)." (Report and Recommendation 16.)

### III. Discussion of the Law

#### A. Standard of Review

Under 42 U.S.C. § 405(g), the court may only review whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). In other words, the court "must uphold the factual findings of the [Commissioner only] if they are supported by substantial evidence *and* were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (emphasis added).

"A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). "Substantial evidence" is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (internal quotation marks omitted). Hence, if the Commissioner's finding is supported by substantial evidence, the court should uphold the Commissioner's finding even if the court disagrees with it. See id.

#### B. Objections

The Commissioner objects to the Magistrate Judge's conclusion that the "record did not contain substantial evidence supporting the commissioner's decision that Plaintiff did not meet or equal listing 12.05." (Objections 1.) "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during

3

the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Listing 12.05(C) is met when the Plaintiff provides evidence of "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. The ALJ concluded that Austin suffered from "arthritis, decreased vision and mental disorders, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet" a listing. (R. at 32.) The ALJ stated in pertinent part that

> It was also indicated by the claimant's treating source that she appeared to have below average intellectual functioning. Accordingly the claimant was referred by the Social Security Administration for psychological testing on September 30, 2002, by Dr. S.A. Wurster [("Dr. Wurster")], a clinical psychologist. Dr. Wurster found the claimant to be alert and oriented with "no indications of a mental health illness" at that time. The claimant was cooperative and well-motivated during testing and was able to comprehend and follow simple directions with no indications of specifically impaired concentration or memory functioning. Her activities of daily living included watching television, eating lunch, taking a nap, playing cards or coloring. On weekends, she attends church, visits with friends and goes to the mall. She helps with household chores, grocery shops with her mother and enjoys going bowling when she has the money for it. Testing via the Revised Wechsler Adult Intelligence Scale (WAIS-R) reveal a full scale IQ of 75 consistent with mid borderline range of intelligence. Test results were considered valid and there was no indication that she had ever functioned at a level significantly higher. The claimant's performance on Wide Range Achievement Testing (WRAT-R) showed that she was reading at the 8th grade level and performing mathematics at the 4th grade level. These results were consistent with the client's intelligence, but not with her report of being in Special Education classes, and it was thought perhaps she was actually in resource classes. Results of Bender Gestalt designs ruled out significant organic impairment, and D.A.P. testing was suggestive of a simple, immature individual with passive dependency. In conclusion, Dr. Wurster considered the claimant capable of performing routine unskilled work tasks of concentrating at such tasks for two-hour periods of time. The claimant was independent in caring for personal needs and was capable of avoiding common physical dangers. Referral to Vocational Rehabilitation for job training was recommended.

4

(Id. at 26-27).

      1.  Work-Related Limitations

First, the Commissioner argues that Austin "presented no evidence of alleged deficiencies in social skills, daily living skills, communication skills, or other indices of deficient adaptive functioning prior to age 22." (Objections 2.) In support of this argument, the Commissioner states that the only evidence presented indicated that Austin was in special education classes for one year, repeated several grades, and attended special education classes. (Id. 2-3.) The ALJ failed to consider the September 2004 evaluation of Dr. Robert E. Brabham ("Dr. Brabham"), a licensed psychologist. Dr. Brabham reviewed Dr. Wurster's evaluation of Austin from 2002, Austin's public school records, and the report of Austin's IQ testing in September 1995 by R. B. Wingard ("Wingard"), a staff psychologist at Vocational Rehabilitation. (R. at 127-28). Dr. Brabham stated as follows:

> Clearly the report as prepared by Wingard is more consistent with the vast preponderance of other evidence in her files, and thus would be a far more valid measure of her intellectual and adaptive skills than the scores and intellectual levels suggested by Dr. Wurster.
>
> The rationale for my opinion is based on several facts, such as the several factual and anecdotal errors in Dr. Wurster's report, raising the possibility that his dictation was somehow confused and records perhaps transposed. For example, he stated emphatically that ". . . she had not gone to the VR Department . . .," when you indicate that she had been a client there several times. He also noted ". . . there was no indications of a mental illness . . . ," and yet she has a history of having been treated for schizophrenia. He also describes her activities of daily living as including ". . . coloring with crayons in children's books . . ." which is generally regarded as indicative of significantly impaired intellectual abilities when seen in adults.
>
> He also apparently dismissed her reports of having been in "Special Education Classes" and introduced some distinction between special education and resource classes, a distinction that I doubt existed at the time that Ms. Austin would have been in school. More importantly, a review of her school records confirms that she

5

> obtained very poor grades, failed grade after grade, and was placed in grades with little valid cause, certainly not based on her earned grades.
>
> [Dr. Wurster's] conclusion that someone with a 4th grade arithmetic level would be inconsistent with reports of having been in special education classes seems to be a clear error in dictation or transcription. Having been in school for 12 years, but with such low scores, would typically be evidence of the validity of special education classes, not an inconsistency. Surely there was some error in the report, as I do not believe that he intentionally made such a statement, with her school records providing ample evidence of academic deficits.
>
> Again, her school records confirm poor academic performance throughout her educational program, apparently beginning with having failed even the first grade in another state, followed by failure after failure in SC as well. The abundance of poor grades, year after year, provides a pattern of poor performance, and is not consistent with a finding of "mid-borderline" IQ scores as stated by Dr. Wurster.

(R. at 127-28 (emphasis in original).) Dr. Brabham concluded that "the additional evidence in the school records clearly supports the opinion that she meets the requirements for a diagnosis of mental retardation rather than borderline intellectual functioning." (Id. at 128 (emphasis in original).) Austin's repeated failures in school along with placement in special education classes support the finding that Austin satisfied the requirements for mental retardation. Austin began first grade at age nine, failed second grade, was promoted from seventh grade to ninth grade when she was sixteen, and "graduated" from high school when she was twenty. During her education, she failed numerous classes. (Id. at 66-67.) Austin's poor performance in school is substantial evidence that her condition manifested itself prior to age 22.

The Commissioner further submits that even if the court found that the ALJ erred in failing to consider Dr. Brabham's opinion, this error is harmless because Dr. Wurster's examination and testing results, Dr. William King's July 23, 2002, assessment that Austin had borderline intellectual functioning, and Dr. David Justice's assessment that Austin suffered from borderline intellectual functioning contradicts Dr. Brabham's opinion. (Id. at 166-68, 182, 242-

43.) However, of this group only Dr. Wurster conducted any formal testing of Austin's intelligence level and reviewed Austin's school records. Further, IQ testing is critical to the assessment of whether a person satisfies the mental retardation listing. Dr. Brabham was the only person to review Dr. Wurster's IQ test results, the 1995 IQ test results, and Austin's school records. These are the critical records for determining whether Austin's condition manifested before age 22 and determining whether Austin's IQ satisfied the listing. Therefore, the failure to consider Dr. Brabham's September 2004 report concluding the Austin's school records support the validity of the 1995 IQ test results and discounting Dr. Wurster's IQ test results is not harmless error.

     2. IQ Test Scores

In addition, the Commissioner argues that the ALJ did not err in failing to consider the 1995 IQ testing performed on Austin. In 1995, a vocational rehabilitation agent of the South Carolina Vocational Rehabilitation Department tested Austin's IQ and found that she met the Vocational Rehabilitation's guidelines for mental retardation. (Id. at 131.) Wingard, a staff psychologist at Vocational Rehabilitation, reviewed the results and the vocational rehabilitation agent's conclusion. Austin was tested using the ABLE ("Adult Basic Learning Examination") and the BETA II tests. (R. at 131.) Austin scored less than 60 on the BETA II test. The ALJ relied on IQ testing performed by Dr. Wurster utilizing the Wechsler Adult Intelligence Scale ("WAIS-R") intelligence test in September 2002, in which Austin was found to have a full scale IQ of 75, verbal IQ of 75, and performance IQ of 76. (Id. at 26-27.) The WAIS-R version Dr. Wurster utilized was five years out of date at the time of Austin's testing. The IQ results from the WAIS-R indicated a mild borderline range of intelligence.

7

> The regulations provide that
>
> > [t]he results of standardized intelligence tests may provide data that help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.
>
> 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a). In addition,
>
> > [d]ue to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.
>
> Id. § 12.00(D)(6)(c). Moreover, the regulations provide that "it is preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities." Id. § 12.00(D)(6)(d)

In reaching his decision, the ALJ did not consider the 1995 IQ testing result, which when converted pursuant to § 12.00(D)(6)(c) results in an IQ score of 59.2 and is the equivalent to Austin scoring an IQ of 55 on the Weschler series.

The Commissioner argues that the ALJ did not err because there is no evidence that the 1995 testing was performed by a qualified specialist as required by 20 C.F.R. part 404, subpart P, appendix 1, § 12.00(D)(5)(a), which states that

> [r]eference to a 'standardized psychological test' indicates the use of a psychological test measure that has appropriate validity, reliability, and norms, and is individually administered by a qualified specialist. By 'qualified,' we mean the

8

> specialist must be currently licensed or certified in the State to administer, score, and interpret psychological tests and have the training and experience to perform the test.

In addition, the Commissioner submits that Wingard provided no comments regarding the validity of the results of the BETA II test. (R. at 131.) The Commissioner submits that the BETA test only assesses performance abilities and the regulations provide that it is "preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities." Id. § 12.00(D)(6)(d).

The court finds that Wingard implicitly found that the BETA II test results were valid when he signed the recommendation, indicating that the results of the BETA II test was less than 60. (R. at 131.) If Wingard, a staff psychologist for South Carolina Vocational Rehabilitation Department, had concerns about the validity of the test, he would have indicated as such. (Id. at 131.) Further, the regulations do not require that an IQ assessment test both verbal and performance abilities. Moreover, there is no evidence that the vocational rehabilitation agent was not qualified to administer the test. In addition, the regulation regarding standardized psychological tests, § 12.00(D)(5), is separate and distinct from the regulations pertaining to intelligence tests, § 12.00(D)(6).

Based on the foregoing, the court finds that the Commissioner's objection is without merit. The ALJ erred in failing to consider the 1995 IQ test results, which clearly provided a score less than 60, and Dr. Brabham's September 2004 evaluation, which further supported the validity of the 1995 IQ test results. Austin has provided evidence of "[a] valid verbal, performance, or full scale IQ" of less than 60, much less 60 through 70. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C). Further, the Commissioner does not argue in his objections that

Austin did not suffer "from a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id.  In addition, the court finds that there is ample evidence in the record that Austin suffered from other physical and mental impairments that significantly limited her ability to perform work related functions.  As the Magistrate Judge noted, Austin suffered from a "right eye cataract; background diabetic retinopathy; diabetes; arthritis; hypertension; hypothyroidism; psychosis secondary to hypothyroidism; major depressive disorder, recurrent, severe; and feet disfigurement."  (Report and Recommendation 16.)  After review, the court finds that the ALJ's decision is not supported by substantial evidence and "reopening the record for more evidence would serve no purpose." Breeden v. Weinberger, 493 F.2d 1002, 1012 (4th Cir. 1974).  Based on the foregoing, the court adopts the Magistrate Judge's Report and Recommendation and incorporates it herein.

       Therefore, it is

       **ORDERED** that the decision of the Commissioner is reversed.  It is further

       **ORDERED** that the case is remanded to the Commissioner for an award of benefits.  It is further

       **ORDERED** that Plaintiff's motion for an extension of time, docket number 28, is denied as moot.

       **IT IS SO ORDERED**.

                                       s/Henry M. Herlong, Jr.
                                       United States District Judge

Greenville, South Carolina
November 26, 2007